Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Joshua D. Smith, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

Docket No.: _____(        )

                                       Plaintiffs,

**Plaintiffs Demand a Trial
by Jury**

           -against-

REFILL RX PHARMACY INC., ALEXANDER
SHARAFYAN, AMR EL SANDUBY, M.D., MANI
USHYAROV, D.O., AND JOHN DOE NOS. "1"
THROUGH "5",

                             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants, Refill RX Pharmacy, Inc., Alexander

Sharafyan, Amr El Sanduby, M.D., Mani Ushyarov, D.O. and John Doe Nos. "1" through "5"

(collectively, "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover damages resulting from the approximately $231,000.00 that the Defendants wrongfully have stolen from GEICO, and further seeks to extinguish approximately $400,000.00 in pending fraudulent billing resulting from the submission of fraudulent claims seeking payment for medically unnecessary, illusory, and formulaic compounded "pain relieving" drug products ("Fraudulent Compounded Pain Creams") allegedly provided to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO ("Insureds").

2.      Refill RX Pharmacy Inc. ("Refill RX"), and its alleged owner, Alexander Sharafyan ("Sharafyan"), spearheaded an egregious scheme to exploit the Insureds' "No-Fault" insurance benefits by presenting Refill RX as a purported neighborhood pharmacy, when, in fact, Refill RX engaged in illegal bulk drug "compounding," regularly dispensing Fraudulent Compounded Pain Creams in set formulations, pursuant to predetermined fraudulent protocols and collusive agreements with various prescribing doctors, to financially enrich themselves rather than to treat or otherwise benefit the Insureds who purportedly received the pain creams.

3.      Refill RX and Sharafyan, rather than dispensing commercially available, FDA-approved medications, intentionally assembled unproven combinations of drug ingredients to create exorbitantly-priced topical compounded pain creams, which have no proven topical therapeutic effects, in order to submit inflated billing to GEICO and other New York insurers. Refill RX and Sharafyan solicited prescriptions for the Fraudulent Compounded Pain Creams to support the intentionally inflated bills, ranging from approximately $845.61 to $1,374.19 for a single tube of pain cream. The Defendants did this knowing that there were a wide range of commercially available, FDA-approved medications with proven therapeutic effects available at a fraction of the cost that could have been dispensed to the patients.

4.     To implement the fraudulent scheme, Refill RX and Sharafyan -- and others working with them, including John Doe Defendants "1" through "5" --  entered into illegal, collusive arrangements with various physicians, including defendants Amr El Sanduby, M.D. ("Sanduby") and Mani Ushyarov, D.O. ("Ushyarov") (collectively, the "Prescribing Defendants").  The Prescribing Defendants worked at various multidisciplinary medical clinics that treated patients with no-fault insurance benefits and fraudulently generated formulaic, coded, and medically unnecessary prescriptions, using labels or rubber stamps supplied by Refill RX and Sharafyan, in violation of New York law.  The Prescribing Defendants did this knowing, among other things, that there was no medical necessity for what was supposed to be a specially tailored and individualized compounded pain cream.

5.     In addition to recovering damages resulting from this fraudulent scheme, GEICO is entitled to a declaration that it is not legally obligated to pay Refill RX for the hundreds of thousands of dollars in pending fraudulent claims the Defendants submitted or caused to be submitted through Refill RX because:

    (i)     The Defendants prescribed, produced and dispensed the Fraudulent Compounded Pain Creams pursuant to predetermined fraudulent protocols solely to financially enrich themselves, without regard for the topical efficacy of the compounded pain creams or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost;

    (ii)    the Defendants participated in illegal, collusive agreements in which Refill RX solicited and received formulaic, medically unnecessary prescriptions from licensed physicians and/or their associates for the Fraudulent Compounded Pain Creams produced by Refill RX, in violation of New York law prohibiting such collusive arrangements for the compounding and dispensing of specially marked prescriptions; and

    (iii)    Refill RX engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on pharmacies, drug

manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

6.      The Defendants fall into the following categories:

(i)      Refill RX is a New York corporation engaged in a fraudulent scheme in which it specializes in producing and dispensing the Fraudulent Compounded Pain Creams to patients and then submitting bills to GEICO and other New York automobile insurers for reimbursement to which it is not entitled;

(ii)     Sharafyan is the purported owner of Refill RX;

(iii)    El Sanduby and Ushyarov (collectively, the "Prescribing Defendants") are physicians who, in violation of New York law prohibiting collusive arrangements for the compounding and dispensing of specially marked prescriptions, entered into collusive arrangements with Refill RX whereby they prescribed, or purported to prescribe, the medically unnecessary Fraudulent Compounded Pain Creams; and

(iv)    John Doe Defendants "1" through "5" are persons and entities, presently not identifiable, who are not and never have been licensed healthcare professionals but who, along with Sharafyan, participated in the operation and control of Refill RX, as well as facilitating the illegal, collusive relationships with the Prescribing Defendants.

7.      Refill RX, Sharafyan, and John Doe Defendants "1" through "5" (collectively, the "Pharmacy Defendants"), began their scheme in 2014, which scheme continues uninterrupted to the present day.  As discussed more fully below, the Defendants at all times have known that: (i) the Defendants produced and dispensed the Fraudulent Compounded Pain Creams pursuant to predetermined fraudulent protocols designed solely to financially enrich themselves, based on prescriptions solicited by Refill RX, without regard for the topical efficacy of the compounded pain creams or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost; (ii) the Defendants participated in illegal, collusive agreements in which Refill RX solicited and received formulaic, medically unnecessary prescriptions from licensed physicians and/or their

associates for the Fraudulent Compounded Pain Creams produced by Refill RX in violation of New York law prohibiting arrangements involving the compounding and dispensing of specially marked prescriptions; and (iii) Refill RX engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on pharmacies, drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault benefits.

8.      As such, Refill RX does not now have – and has never had – any right to be compensated for the Fraudulent Compounded Pain Creams allegedly dispensed to GEICO insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO.  As a result of the Defendants' scheme, GEICO has incurred damages of approximately $231,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.      Defendants

10.      Defendant Refill RX is a New York corporation, incorporated on or about February 8, 2013, with its principal place of business at 63-24 Austin Street, Rego Park, New York.

11.     Refill RX, through the present day, knowingly has submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

12.     Refill RX engages in pharmaceutical compounding activities and specializes in producing and dispensing compounded pain creams.

13.     Refill RX is registered with New York State as a pharmacy, but is not registered as a manufacturer or outsourcing facility.

14.     Refill RX is not permitted to engage in bulk compounding or specialize in dispensing large quantities of compounded pain creams that are not specially tailored to the needs of individual patients.

15.     Defendant Sharafyan resides in and is a citizen of New York. Sharafyan is listed as the owner of record, officer and registered agent for Refill RX.

16.     Sanduby resides in and is a citizen of New York. Sanduby was licensed to practice medicine in New York on September 19, 2000.  Sanduby knowingly has participated in a scheme to prescribe the Fraudulent Compounded Pain Creams to GEICO Insureds.

17.     Effective October 13, 2017, Sanduby was disciplined by the New York State Office of Professional Medical Conduct, and specifically prohibited from conducting, interpreting and/or billing for neuro-diagnostic testing for a period of two years unless modified by the Office of Professional Medical Conduct.

18.     Ushyarov resides in and is a citizen of New York. Ushyarov was licensed to practice medicine in New York on January 19, 1996. Ushyarov knowingly has participated in a scheme to prescribe the Fraudulent Compounded Pain Creams to GEICO Insureds.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

20.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

21.     GEICO underwrites automobile insurance in the State of New York.

22.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

24.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

25.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

26.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals, relying on the implementing regulation, 11 N.Y.C.R.R. § 65-3.16(a)(12), made clear that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault benefits. The Court of Appeals further provided that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

27.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   An Overview of Applicable Licensing Laws

28.   The United States Federal Food, Drug, and Cosmetic Act ("FDCA") authorizes the United States Food and Drug Administration ("FDA") to oversee the safety of food, drugs, and cosmetics.

29.   Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

30.   Manufacturers and outsourcing facilities that seek to register with the New York State Department of Education, as required by New York Education Law § 6808, must also register with the FDA and be listed as a manufacturer or outsourcing facility on the FDA website.

31.   New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions, while New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of secret formula ("coded") prescriptions.

32.   New York Education Law § 6530(18) prohibits a licensed physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in exchange for patient referrals or in connection with the performance of professional services.

33.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

34.     8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

### III.     An Overview of Compounded Drug Products

35.     The FDA strictly regulates over-the-counter and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

36.     FDA-approved drugs require: (i) approval prior to marketing; (ii) compliance with federal labelling laws; and (iii) that the drugs be made and tested in accordance with good manufacturing practice regulations (GMPs), which are federal statutes that govern the production and testing of pharmaceutical products.

37.     Pursuant to Section 503A of the Federal Food, Drug and Cosmetic Act ("FDCA"), as amended by the Compounding Quality Act, the laws applicable to drugs regulated by the FDA, including the laws relating to the safe manufacturing of drugs, generally do not apply to a "compounded" drug product: (1) if the drug product is compounded for an identified individual patient based on the receipt of a valid prescription order that a compounded product is necessary for the identified patient, and (2) if the compounding is performed by a licensed pharmacist in a state licensed pharmacy.

38.     The FDA defines traditional pharmacy compounding as the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription. Traditional pharmacy compounding plays a role in providing access to medications for patients with unique medical needs, which cannot otherwise be met with a commercially available product. State licensed pharmacies may compound specified medications when an FDA-approved drug product is not available or appropriate for a patient, including strength or route of delivery.

39.     Compounded drugs are generally not FDA-approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process which applies to new drugs if the drug is compounded for an identified individual patient based on the receipt of a valid prescription, approved by the prescribing practitioner on the prescription order, that a compounded product is necessary for the identified patient. See 21 U.S.C. § 353a.

40.     Unlike FDA-approved products, consumers and prescribers cannot assume that compounded drugs were made by validated processes in properly calibrated and cleaned equipment; that the ingredients in the drug were obtained from FDA-approved sources; that production personnel had the requisite knowledge and training; and that appropriate laboratory testing was performed to verify the compounded drug's potency, purity, and quality.

41.     The FDA has publically expressed concern regarding large-scale drug manufacturing under the guise of traditional small-scale pharmacy compounding.  For example, the FDA has noted that poor practices on the part of bulk drug compounders can result in contamination or products that do not possess the strength, quality, and purity required. Published reports also consistently show that compounded drugs fail to meet specifications at a considerably higher rate than FDA-approved drugs.

42.     Traditional pharmacy compounding by state licensed pharmacies, therefore, is permissible when done on a small scale by pharmacists who prepare the medication based on an individual prescription.  Specifically, when compounded drugs meet the requirements of 21 U.S.C. § 353a and are compounded for an individual patient, they can be exempted from the requirement, among others, that they be FDA-approved.  See 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to... this section is effective with respect to such drug").

43.     When Congress adopted 21 U.S.C. § 353a, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.)(emphasis added).  As Congress stated at the time:

> the "exemptions in [this section] are limited to compounding for an individual patient based on the medical need of such patient for the particular drug compound. To qualify for the exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient."

S. Rep. No. 105-43, at 67-68 (1997)(emphasis added).

44.     Because compounded products are not FDA-approved, and therefore, not subject to FDA regulations regarding quality, safety and effectiveness of manufactured drug products, they should never be prescribed as a matter of routine therapy, and should only be prescribed to

meet a legitimate specific need of an individual patient, or when all other forms of oral and/or topical medications approved for the treatment of pain have failed.

45.     Prior to receiving a prescription for any compounded drug product, a patient's medical records should document all other forms of FDA-approved drugs that were prescribed and failed to treat the symptom for which the compounded drug product was then prescribed, and/or the medical rationale that supports the otherwise premature prescription of a compounded drug product.

46.     The prescription of compounded drug products and ensuing billing to both private and public insurers has been the subject of state and federal investigations and litigation due to increased concerns regarding fraud.  For example:

- in January 2014, the United States Attorney for the District of New Jersey filed a criminal complaint against a pharmacist, who thereafter pled guilty, in connection with a fraudulent scheme involving payment of kickbacks to a physician in exchange for prescriptions for compounded pain creams.  See USA v. Kleyman, 1:14-CR-598-JHR, Docket No. 1.

- in February 2016, the United States Attorney for the Northern District of Texas arrested and indicted two laypersons, who conspired with physicians and pharmacies, in a scheme involving producing, prescribing, and distributing compound creams, including payment of kickbacks to prescribing physicians and insured beneficiaries. See USA v. Cesario, 3:16-CR-060-M, Docket Nos. 3, 75.

- in June 2016, the United States Attorney for the Middle District of Florida indicted a physician who engaged in a fraudulent scheme with numerous co-conspirators involving payment of kickbacks for the referral of patients and prescriptions for compounded creams. See USA v. Baldizzi, 8:16CR271-MSS-AEP, Docket No. 1.

- in August 2016, the United States Attorney for the Southern District of New York indicted more than 40 members of the Genovese, Gambino, Luchese, and Bonanno crime families, whose alleged illegal activities included "causing…corrupt doctors to issue unnecessary and excessive prescriptions for expensive compound cream" billed to insurers.  See USA v. Parrello, 16 Crim. 522 (2016).

47.     Further, the United States Department of Health & Human Services and the United States Postal Service both have issued reports documenting fraud concerns with compounded drugs. See U.S. Department of Health & Human Services, Office of Inspector General, *High Part D Spending on Opioids and Substantial Growth in Compound Drugs Raise Concerns*, HHS OIG Data Brief, OEI-16-00290 (June 2016); Office of Inspector General, United States Postal Services, *Worker's Compensation Compound Drug Costs, Management Advisory,* Report No. HR-MA-16-003 (March 14, 2016).  The USPS OIG attributed fraud as one cause for the "unprecedented increases" in compound drug costs and referenced an "alarming discovery" of physicians prescribing unnecessary compound drugs in exchange for kickbacks. Id.

## IV.     The Defendants' Scheme Involving The Fraudulent Compounded Pain Creams

48.     Beginning in 2014, and continuing uninterrupted through the present day, the Pharmacy Defendants masterminded and implemented a fraudulent scheme in which they used Refill RX to bill the New York automobile insurance industry for hundreds of thousands, if not millions, of dollars in inflated charges – which it was not eligible to receive – relating to the Fraudulent Compounded Pain Creams purportedly provided to Insureds.

49.     Sharafyan is listed as the sole owner and operator of Refill RX.

50.     Sharafyan did not own or operate any other pharmacy prior to becoming the sole owner and operator of Refill RX.

51.     Sharafyan had no prior work experience with prescription drug products, prior to becoming the sole owner and operator of Refill RX.

52.     Sharafyan is not familiar with New York State licensing or registration requirements affecting pharmacies.

53.     Sharafyan does not know whether any of the compounded drug products that Refill RX dispenses are effective.

54.     Sharafyan does not know if there are any medical studies or literature regarding the efficacy of the compounded drug products that RX Refill dispenses.

55.     Sharafyan is unfamiliar with the billing and reimbursement rules applicable to No-Fault insurance for pharmaceutical drug products.

56.     Sharafyan has virtually no knowledge of the lease he purportedly signed on behalf of Refill RX, as tenant, or why he and Refill RX are listed as guarantors of the obligations of another company pursuant to Refill RX's lease.

57.     Sharafyan holds a driver's license issued by the Commonwealth of Pennsylvania, which license lists a Pennsylvania address as his residence.

58.      Sharafyan spends substantial time in Pennsylvania, far from where Refill RX is located in Rego Park, New York.

59.     Sharafyan has been assisted in the operation of Refill RX by Irina Esterov, who filed the certificate of incorporation for Refill RX and who helped Sharafyan open Refill RX's bank account.

60.     Sharafyan does not know for sure whether Irina Esterov has online access to Refill RX's bank password and user name, but he believes that she "probably" has such access.

61.     Sharafyan does not exercise genuine control and/or decision-making authority relating to the operation and management of Refill RX.

62.     John Doe Nos. "1" through "5" exercise control and decision-making authority relating to the operation and management of Refill RX.

63.     Sharafyan is the owner, in name only, of Refill RX, and serves as the sole owner to create the appearance that Refill RX is a small, neighborhood pharmacy.

64.     Despite purporting to be a neighborhood pharmacy, Refill RX specializes in producing and dispensing compounded drug products.

65.     Despite purporting to be a neighborhood pharmacy, Refill RX has dispensed large quantities of the Fraudulent Compounded Pain Creams.

66.     Refill RX has dispensed the Fraudulent Compounded Pain Creams, which are not approved by the FDA, in set formulations, without tailoring the medications to the individual needs of any individual patient, and without complying with licensing requirements that are designed to ensure the quality, safety and effectiveness of bulk compounded drug products.

67.     Refill RX, rather than dispensing commercially available, FDA-approved medications with proven efficacy, intentionally produced and dispensed exorbitantly priced compounded "pain creams" (i.e., the Fraudulent Compounded Pain Creams) by intentionally assembling combinations of expensive drug ingredients without regard to the absence of any proven topical efficacy of the combination of ingredients.

68.     Refill RX billed GEICO approximately $845.61 to $1,374.19 for each single tube of compounded pain cream.

69.     Refill RX billed GEICO, which makes up only a fraction of the New York automobile insurance market, more than $560,000.00 in charges for the Fraudulent Compounded Pain Creams.

70.     Refill RX billed other New York automobile insurers, collectively, hundreds of thousands of dollars – if not millions – more than what it has billed to GEICO alone.

71.     The Defendants knew that the topical efficacy of the voluminous Fraudulent

Compounded Pain Creams that Refill RX produced and dispensed was unproven and knew that there was a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost.

72.     The Defendants knew that there was no legitimate medical need for the Fraudulent Compounded Pain Creams that could explain why a commercially available drug product would not be appropriate for the patients who were instead prescribed and dispensed the exorbitantly-priced compounded pain creams.

73.     The Pharmacy Defendants, solely to maximize profits, had Refill RX specialize in illegal compounding, producing large quantities of compounded drugs in set formulations, as part of collusive arrangements made with licensed physicians and their associates (i.e., the "Prescribing Defendants ") to compound and dispense specially marked, formulaic prescriptions.

74.     The Pharmacy Defendants gave out pre-printed labels and/or rubber stamps to licensed physicians and others, which contained the names and ingredients of the compounded pain creams that were created and produced by Refill RX.

75.     The Pharmacy Defendants, using the pre-printed labels and/or rubber stamps, arranged to have the Prescribing Defendants issue coded, predetermined prescriptions, so that the Fraudulent Compounded Pain Creams could be dispensed and billed pursuant to the Defendants' predetermined, fraudulent protocol.

76.     Specifically, in furtherance of the fraudulent scheme, the Prescribing Defendants, operating from No-Fault Clinics that treat thousands of Insureds, purported to prescribe the medically unnecessary and illusory Fraudulent Compounded Pain Creams to the Insureds, which in turn permitted the Pharmacy Defendants to bill GEICO for the Fraudulent Compounded Pain Creams under the name of Refill RX.

77.     To conceal the scheme, the Pharmacy Defendants presented Refill RX as a legitimate, neighborhood pharmacy engaged in lawful, limited pharmacy drug compounding in response to valid prescriptions received from the Prescribing Defendants.

78.     Notwithstanding the Pharmacy Defendants' attempt to conceal the scheme and present Refill RX as a neighborhood pharmacy, the Defendants directly violated New York State and Federal regulatory and licensing requirements that govern large-scale drug compounders, drug manufacturers and outsourcing facilities and which prohibit collusive arrangements for compounding and/or dispensing of coded or specially marked prescriptions – all of which poses a significant threat to the health and safety of the patients.

79.     The Fraudulent Compounded Pain Creams produced by Refill RX (i) were not medically necessary; (ii) contained a combination of ingredients that produced no significant difference between the compounded drug and comparable commercially available products; (iii) were almost never prescribed properly under the governing regulations; and (iv) were "prescribed" and produced in large quantities without regard to medical necessity or the regulations governing the appropriate use of compounded drug products, as part of unlawful arrangements with the Prescribing Defendants.

80.     In short, the Fraudulent Compounded Pain Creams produced by Refill RX, and prescribed by the physicians and their associates working in collusion with Refill RX, served no purpose other than to exploit the Insureds' No-Fault benefits so as to financially benefit the Defendants.

A. **Refill RX Specialized in Large Scale Drug Compounding Activity in Violation of New York State and Federal Law Governing Drug Manufacturers and Outsourcing Facilities**

81. As stated above, compounded drug products are only appropriate in limited circumstances, should be formulated for an individual patient's needs upon receipt of a valid prescription for an identified individual or a notation on a prescription stating that a compounded product is necessary for the identified patient, and should not be prescribed and dispensed as a matter of course.

82. The Pharmacy Defendants, however, blatantly exploited the No-Fault insurance reimbursement system by entering into collusive relationships involving the marketing and soliciting of prescriptions for the same set of predetermined Fraudulent Compounded Pain Creams that were dispensed again and again to numerous Insureds involved in minor fender-bender type accidents, generating millions of dollars in fraudulent billing to New York automobile insurers.

83. Refill RX, at all relevant times, specialized in creating and dispensing the Fraudulent Compounded Pain Creams.

84. Refill RX, acting under the guise of a neighborhood pharmacy, intentionally assembled a combination of expensive drug ingredients solely to produce exorbitantly priced topical compounded pain creams that it could use to generate huge volumes of inflated billing, as part of a collusive, steering relationships with the Prescribing Defendants

85. In furtherance of the scheme, the Pharmacy Defendants gave the Prescribing Defendants a set list of the Fraudulent Compounded Pain Creams that Refill RX created, via a series of labels or rubber stamps that contained the name of the compounded pain cream and the

formulation, including the names of the particular drug ingredients and percentage concentrations of each ingredient used.

86.     For example, the Pharmacy Defendants produced, marketed and dispensed, among others, the following predetermined, formulaic Fraudulent Compounded Pain Creams:

- Compound RX 218N pain cream, with the following ingredients:

  o Lidocaine
  o Ketoprofen
  o Ibuprofen
  o Gabapentin
  o Ethnoxy diglycol
  o Cyclobenzaprine hydrochloride
  o Baclofen
  o Penderm cream base

- Compound RX 220W pain cream, with the following ingredients:

  o Flurbiprofen
  o Baclofen
  o Lidocaine
  o Cyclobenzaprine hydrochloride
  o Ethnoxy diglycol
  o Gabapentin
  o Pentravan cream

- Compound RX 2 pain cream, with the following ingredients:

  o Flurbiprofen
  o Blacofen
  o Cyclobenzaprine
  o Impramine
  o Ethoxy Diglycol
  o Versapro Cream

- Compound RX 4 pain cream, with the following ingredients:

  o Flurbiprofen
  o Cyclopenzaprine
  o Ethoxy Diglycol
  o Imipramine
  o Gabapentin
  o Baclofen

- o Menthol
- o Versapro Cream

87.     Refill RX typically billed GEICO (i) $845.61 or $852.49 for single tube of the Compound RX 218N pain cream; (ii) $1,374.19 for a single tube of Compound RX 220W pain cream; (iii) $1,027.83 for a single tube of Compound RX 2 pain cream; and (iv) $1,348.75 for a single tube of Compound RX 4 pain cream.

88.     The Fraudulent Compounded Pain Creams were not created or prescribed by the Prescribing Defendants to meet the unique needs of any individual patient.

89.     Instead, the Fraudulent Compounded Pain Creams were produced and dispensed by Refill RX in large quantities without regard to the unique needs of any individual patient.

90.     The Pharmacy Defendants never cited a legitimate medical need for Fraudulent Compounded Pain Creams that would explain why a commercially available drug product was not appropriate to dispense to the Insureds who received the Fraudulent Compounded Pain Creams.

91.     Likewise, the Prescribing Defendants never cited a legitimate medical need for Fraudulent Compounded Pain Creams that would explain why a commercially available drug product was not appropriate to prescribe for the Insureds who received the Fraudulent Compounded Pain Creams.

92.     As part of the collusive arrangement with the Prescribing Defendants, the Pharmacy Defendants produced and distributed the predetermined and Fraudulent Compound Pain Creams, together with a series of "prescription labels" or "prescription rubber stamps," bearing the names, ingredients, and concentrations of those predetermined and formulaic compounded products, which the Prescribing Defendants then used to imprint their official New

York State prescription pads to prescribe the Fraudulent Compounded Pain Creams to the Insureds.

93.     Through the use of the specially marked, or coded prescriptions, with the "prescription labels" or "prescription rubber stamps," the Pharmacy Defendants steered the Prescribing Defendants to prescribe the Fraudulent Compounded Pain Creams as part of a predetermined treatment and billing scheme.

94.     Despite the fact that traditional pharmacy compounding requires the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription, the prescription labels and/or rubber stamps indicate that the Pharmacy Defendants created predetermined compounded drug products that were produced in bulk.

95.     Accordingly, the Fraudulent Compounded Pain Creams, prescribed by the Prescribing Defendants, and produced by the Pharmacy Defendants, were not customized for individual patients.

96.     The Fraudulent Compounded Pain Creams varied only in that there were a limited number of predetermined Fraudulent Compounded Pain Creams from which to choose.

97.     A representative sample of Refill RX's bills and the accompanying prescriptions allegedly issued by the Prescribing Defendants containing labels or rubber stamps, used to prescribe the Fraudulent Compounded Pain Creams to Insureds, and which the Defendants submitted to GEICO in support of their fraudulent billing, is annexed hereto as Exhibit "2".

98.     Refill RX, by specializing in creating and dispensing large volumes of the Fraudulent Compounded Pain Creams, engaged in bulk compounding activity (akin to that

22

engaged in by drug manufacturers and outsourcing facilities) as opposed to compounding individual prescriptions on a case-by-case basis upon receipt of a valid prescription order.

99.     Refill RX has asserted that prescriptions dispensed to patients insured through No-Fault automobile insurance makes up only about two or three percent of its business.

100.     GEICO makes up only a fraction of the New York automobile insurance market, meaning that in all likelihood Refill RX billed all New York automobile insurers more than three times the amounts billed to GEICO.

101.     Refill RX dispensed compounded pain cream products to patients with other types of insurance, aside from No-Fault automobile insurance.

102.     If Refill RX's assertion is true that the prescriptions dispensed to patients insured through No-Fault automobile insurance make up only about two or three percent of its business, it is likely that Refill RX billed all types of insurers millions of dollars more for compounded pain creams.

103.     Based on Refill RX's own claim that patients with No-Fault automobile insurance made up only about two or three percent of its business, Refill RX dispensed huge volumes of the Fraudulent Compounded Pain Creams to patients.

104.     The Pharmacy Defendants' creation and dispensation of predetermined, compounded drug products in large volumes, renders Refill RX in violation of both state and federal licensing laws regulating the safe manufacturing of drugs.

105.     Refill RX and the Fraudulent Compounded Pain Creams are not exempt from FDA oversight and approval, and similar New York State licensing requirements applicable to drug manufacturers and outsourcing facilities, because the Fraudulent Compounded Pain Creams were clearly not individualized and tailored to meet specific individual patient needs, were not

provided pursuant to legitimate prescriptions, and were illegally compounded in set formulations in large quantities. See 21 U.S.C. § 355 and 21 U.S.C. 353a(a).

106.    Furthermore, as drug manufacturers and dispensers, the Pharmacy Defendants violated 21 U.S.C. § 355(a) which states that "no person shall introduce or deliver for introduction into interstate commerce any new drug" without first obtaining approval to do so by way of an application filed with the Secretary with respect to that drug.

107.    A "new drug" – as defined by 21 U.S.C. § 321(p)(1) – is "any drug…the composition of which is such that such drug is not generally recognized…as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof."

108.    Refill RX's Fraudulent Compounded Pain Creams – for which it has billed GEICO alone hundreds of thousands of dollars – have never been FDA-approved and, therefore, were never verified by the FDA as being safe, effective or quality products.  In fact, Refill RX's bulk compounding and dispensing of the Fraudulent Compounded Pain Creams exposed Insureds to widespread risks including harmful contraindications, which is why they should have only been prescribed under unique circumstances in limited circumstances.

**B.      The Prescription and Dispensation of Refill RX's Compounded Pain Creams Was Contrary to Evidenced-Based Medical Practices**

109.    In keeping with the fact that the Fraudulent Compounded Pain Creams were prescribed pursuant to the Defendants' fraudulent scheme intended to generate profits from insurers, Refill RX's Fraudulent Compounded Pain Creams (i) had no medical efficacy based on the purported symptoms of the patients receiving the compounded products and (ii) were prescribed without any legitimate reason to provide the patients with expensive compounded products – which include drugs whose efficacy in topical form is undocumented and unsupported

– when there are many other widely accepted, proven effective alternatives with well documented therapeutic benefits commercially available at considerably lower costs.

110.    Evidence-based guidelines for the treatment of acute pain do exist and should always guide prescribing habits. The World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or a nonsteroidal anti-inflammatory drug ("NSAID") for the initial management of pain. NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers, and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use. Clinical studies of FDA-approved topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries) in superficial locations.

111.    Because compounded products, like the ones dispended by Refill RX, are not FDA-approved – and therefore not subject to FDA regulations regarding quality, safety and effectiveness of manufactured drug products – they should never be prescribed as routine therapy.

112.    Because compounded products, like the ones dispensed by Refill RX, are not FDA-approved – and therefore not subject to FDA regulations regarding quality, safety and effectiveness of manufactured drug products – they should only be prescribed to meet a legitimate specific need of an individual patient, or when all other forms of oral and/or topical medications approved for the treatment of pain have failed, or there is a contraindication for use.

113.    Topical compounded creams should be the last prescribed intervention, after oral medications are not tolerated or are deemed ineffective, as well as after any FDA-approved manufactured topical products have been shown to provide no pain relief to the patient.

114.    For a topical formulation to be effective, it must first penetrate the skin.  In general, creams are less effective than gels or sprays.

115.    The skin is composed of three layers: epidermis, dermis, and hypodermis.  Within the epidermis, the stratus corneum is the outermost layer of the skin that serves as the main barrier to drug entry.  For analgesic medicines to be absorbed through the skin, they must contain optimal drug combinations, effective concentrations of each drug, and a compounding base with the appropriate physiochemical properties to facilitate absorption.

116.    In order for a drug to alleviate pain, it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

117.    Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated – those with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral nonsteroidal anti-inflammatory drugs (e.g., history of peptic ulcer disease or congestive heart failure).

118.    Refill RX's Fraudulent Compounded Pain Creams contain combinations of drugs that make no clinical sense and have no efficacious value in treating musculoskeletal and neuropathic injuries – even assuming that the Insureds the Prescribing Defendants treated actually suffered from such injuries.

119.     There are no published, peer-reviewed, controlled studies to support that patients who suffer from musculoskeletal pain or neuropathy have achieved any therapeutic effect from using topical pain creams containing the drugs that are part of the Fraudulent Compounded Pain Creams.

120.     Further, many of the Fraudulent Compounded Pain Creams are available in alternative oral formulations or are commercially available in different topical formulations.

121.     The alternatives to the Fraudulent Compounded Pain Creams, whether in oral formulations or commercially available topical formulations, have proven to therapeutically benefit patients with musculoskeletal and neuropathic pain, are FDA-approved, and are commonly prescribed by healthcare providers who utilize evidence-based medicine for their prescribing practices.

122.     Contrary to evidenced-based medical practices, the Fraudulent Compounded Pain Creams were routinely prescribed by the Prescribing Defendants and administered without regard to whether other forms of oral and/or topical medications approved for the treatment of pain have failed, or there was a contraindication for their use.

123.     The Prescribing Defendants failed to practice evidence-based medicine; rather, the Prescribing Defendants prescribed the Fraudulent Compounded Pain Creams based on their illegal, collusive arrangements with the Pharmacy Defendants that employed a fraudulent predetermined treatment and billing protocol designed to enrich all of the Defendants.

124.     Tellingly, the Prescribing Defendants often prescribed the Fraudulent Compounded Pain Creams during periodic visits to the various No-Fault medical mills, without any review of the primary treating doctor's notes or records, and without any consultation with such practitioner.

125.   In fact, in at least some instances, the Prescribing Defendants signed blank prescriptions so that a stamp or label containing the compound cream ingredients could be applied later by unlicensed laypersons associated with the various No-Fault Clinics. The Prescribing Defendants pre-signed these prescriptions without knowing or caring what particular Fraudulent Compounded Pain Cream was being "prescribed" under his name.

126.   In keeping with the fact that the Prescribing Defendants signed blank prescriptions, the Pharmacy Defendants sent at least one bill to GEICO for a Fraudulent Compounded Pain Cream that included a blank prescription signed by Sanduby. A copy of this prescription is annexed hereto as Exhibit "3".

127.   Additionally, the Pharmacy Defendants sent numerous bills to GEICO for Compounded Pain Creams that included prescriptions containing preprinted labels that had been placed *over* a part of the prescribing physician's signature, indicating that the prescription had ben pre-signed. Copies of sample billing submissions showing this practice are annexed hereto as Exhibit "4".

128.   Even if the Prescribing Defendants knew about, and authorized, the prescriptions for particular Fraudulent Compounded Pain Creams, the Prescribing Defendants failed to recommend that the Insureds first try over-the-counter FDA-approved topical medications and assess their effectiveness, prior to prescribing the Fraudulent Compounded Pain Creams produced and dispensed by the Pharmacy Defendants in large quantities.

129.   The Prescribing Defendants also did not document in their examination reports that the patients were intolerant of commercially available products.

130.    The Prescribing Defendants also did not document in their examination reports why any compounded drug product was medically necessary, or why the particular Fraudulent Compounded Pain Product they ultimately prescribed for the patient was medically necessary.

131.    The Prescribing Defendants also failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Product prescribed to a particular patient was actually used by the patient.

132.    The Prescribing Defendants also failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Product provided any pain relief to the patient or was otherwise effective for the purpose prescribed.

133.    The Prescribing Defendants plainly failed to prescribe individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available product.

134.    Likewise, Refill RX never dispensed individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available product.

135.    The combination of drugs used in the Fraudulent Compounded Pain Creams was merely a means for the Defendants to inflate the billing and maximize their charges to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily reimbursed for each individual ingredient contained in a compounded drug product.  As a result, the more drug ingredients that Refill RX included in its Fraudulent Compounded Pain Creams, the more that the Pharmacy Defendants could bill under the name of Refill RX.

C.    The Fraudulent Compounded Pain Creams Were Prescribed and Dispensed Without Regard to Genuine Patient Care

136.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner.   Notwithstanding this basic goal, the Insureds treated by the Prescribing Defendants were virtually always subjected to a predetermined treatment protocol, which was both unnecessarily prolonged and totally lacking in individualized care, which did not utilize evidence based practices with the goal of the Insureds' timely return to good health.   Conversely, the treatment reports almost uniformly reflected that the Insureds treated by the Prescribing Defendants did not get better, did not return to good health, and/or did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

137.    As part of the predetermined protocol, the Prescribing Defendants produced examination reports that were generic, preprinted, and boilerplate, designed to justify continuing, voluminous and excessive healthcare services that the No-Fault Clinic providers purported to render to Insureds thereafter – including the prescription of Fraudulent Compounded Pain Creams.

138.    Notwithstanding the creation of the examination reports, the Prescribing Defendants' prescriptions of the Fraudulent Compounded Pain Creams were not medically necessary and were based on a predetermined protocol, provided without regard to the genuine needs of the patients.

139.    To the extent any examination was actually performed at all, the Prescribing Defendants failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Compounded Pain Creams.   Prescribing compounded products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as

the Prescribing Defendants often did not know whether the patient was currently taking any medication or suffering from any co-morbidities that would contraindicate the use of a compounded drug product.

140.    The Prescribing Defendants' failure to document a detailed medical history of the patients to whom they prescribed the Fraudulent Compounded Pain Creams is also indicative that the Prescribing Defendants did not prescribe the compounded drug products to meet the unique needs of a particular patient that could not be met with an existing FDA-approved medication because the inadequate examinations would not be able to identify any such unique needs.

141.    What is more, the Prescribing Defendants' initial examination reports and follow-up examination reports made no mention whatsoever of the specific Fraudulent Compounded Pain Creams the Insureds were prescribed. The follow up exams, in particular, failed to document the result of the prescribed compound.

142.    The Prescribing Defendants' inadequate initial examination and follow-up examination reports provide further evidence that (i) the Fraudulent Compounded Pain Creams were not medically necessary and were provided and billed for pursuant to a predetermined fraudulent protocol; (ii) the Fraudulent Compounded Pain Creams were not individually tailored to meet the unique needs of a particular patient in response to a valid prescription and, therefore, not FDA-exempt; (iii) the Pharmacy Defendants and the Prescribing Defendants were engaged in collusive steering arrangements in violation of New York law; and (iv) Refill RX is not a neighborhood pharmacy, but an illegal manufacturer and producer of predetermined, mass produced drug products acting in violation of law.

**D.**     **The Illegal, Collusive Arrangements Between Refill RX and the Prescribing Defendants**

143.     In furtherance of the fraudulent scheme, the Defendants participated in illegal, collusive arrangements in which the Prescribing Defendants named herein (along with the other prescribing providers), prescribed the medically unnecessary Fraudulent Compounded Pain Creams in violation of New York law.

144.     New York's statutory framework specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See Education Law § 6530(38) and § 6811 (7).   In fact, Education Law § 6811 (7) makes such agreements criminal.

145.     Here, the Pharmacy Defendants arranged with various No-Fault Clinics that treat thousands of Insureds to have the licensed physicians and/or their associates operating therefrom, including the Prescribing Defendants, prescribe, or purport to prescribe, the medically unnecessary and illusory Fraudulent Compounded Pain Creams to the Insureds, which in turn permitted the Pharmacy Defendants to bill GEICO huge sums under the name of Refill RX.

146.     In furtherance of the scheme, the Prescribing Defendants intentionally prescribed, or purported to prescribe, the Fraudulent Compounded Pain Creams to patients of the No-Fault Clinics pursuant to the Defendants' fraudulent predetermined treatment and billing, without regard to genuine patient care, without regard to pharmacologic outcomes, and without regard to cost and attention to fiscal responsibility.

147.     In furtherance of the scheme, the Prescribing Defendants prescribed, or purported to prescribe, the Fraudulent Compounded Pain Creams to patients of the No-Fault Clinics pursuant to formulaic, coded "prescriptions," rubber-stamped with the name and formula of one of the Fraudulent Compounded Pain Creams produced by Refill RX.

148.    The Pharmacy Defendants supplied pre-set labels or rubber-stamps to the Prescribing Defendants, who used the stamp or label on their New York State prescription forms in order to repeatedly issue predetermined, formulaic, and unnecessary compounded pharmaceuticals designed to exploit the patients' No-Fault insurance benefits.

149.    In fact, the Prescribing Defendants prescribed, or purport to prescribe, the Fraudulent Compounded Pain Creams to patients of the No-Fault Clinics, despite their knowledge that the Fraudulent Compounded Pain Creams were not customized or tailored to the individual needs of a particular patient; despite their knowledge that there were FDA-approved drugs available and appropriate for the particular patients; and despite their knowledge that the Fraudulent Compounded Pain Creams were medically unnecessary, and were being prescribed without regard to pharmacologic outcomes or cost and attention to fiscal responsibility.

150.    The Pharmacy Defendants never gave the prescriptions to the Insureds to fill (even though the prescriptions were paper prescriptions) and did not give the Insureds the option to use a pharmacy of their choosing.

151.    The Pharmacy Defendants directed the prescriptions for the Fraudulent Compounded Pain Creams to Refill RX – and no other pharmacy – because the prescriptions were only being issued because of the illegal, collusive arrangements among the Pharmacy Defendants and the Prescribing Defendants.

152.    Refill RX purported to mail or deliver the Fraudulent Compounded Pain Creams directly to the Insureds' homes, without the patient ever receiving the actual written prescription and, in many cases, without the patient even knowing that they were to receive a pain cream.

153.    Alternatively, the Insureds sometimes were given the Fraudulent Compounded Pain Creams directly from the front desk staff at the various No-Fault Clinics again without ever

seeing the actual prescription or, in many cases, not even knowing that they were to receive a pain cream.

154.    The Prescribing Defendants did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Refill RX and to ensure that the Pharmacy Defendants benefitted financially from the prescriptions.

155.    The Prescribing Defendants had no legitimate medical reason to prescribe the predetermined, medically unnecessary Fraudulent Compounded Pain Creams in large quantities to their patients.

156.    The Prescribing Defendants had no legitimate business reason basis to direct their prescriptions for compounded pain creams to Sharafyan and Refill RX, as Sharafyan had no prior pharmacy experience, was not familiar with New York State pharmacy licensing and registration requirements, did not know whether any of the compounded pain creams were effective, and was unaware of any studies or medical literature regarding the efficacy of the compounded pain creams.

157.    The Prescribing Defendants would not have engaged in the illegal, collusive arrangements with the Pharmacy Defendants in violation of New York law, including using rubber stamps or labels distributed by the Pharmacy Defendants, intentionally prescribing medically unnecessary predetermined compounds, and directing those prescriptions to Refill RX, unless they profited from their participation in the illegal scheme.

158.    But for the payments of kickbacks from the Pharmacy Defendants, the Prescribing Defendants would not have prescribed the predetermined, medically unnecessary Fraudulent Compounded Pain Creams, which were not individually tailored to meet a unique need of any particular patient, and would not have directed the prescriptions to Refill RX.

159.    The Pharmacy Defendants and the Prescribing Defendants have affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

160.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Pharmacy Defendants paid a financial kickback, and the Prescribing Defendants received a financial kickback, for each of the particular prescriptions for the Fraudulent Compounded Pain Creams that were dispensed by Refill RX.  The payment of such kickbacks was made at or near the time the prescriptions were issued.

**E.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

161.    The maximum amount that a healthcare provider may charge for a medically necessary compounded product is based on each individual ingredient included in the compounded product.  Each prescribed ingredient, whether a brand name or generic drug, included in a compounded product has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

162.    Each NDC (and, thus, the AWP) for a particular ingredient differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

163.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug included in a compounded product, a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

164. For each generic drug included in a compounded product, the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

165. AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

"[t]he average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee."

166. When a pharmacist bills for dispensing compounded products, it must bill based on the actual NDC number (and the assigned AWP) of each of the ingredients dispensed as part of the compounded product. It cannot use the NDC of the same ingredient available from a different supplier and/or purchased in different quantities in order to inflate the assigned AWP.

167. The Pharmacy Defendants purported to provide the Fraudulent Compounded Pain Creams – billed through Refill RX – directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms. With regard to compounded products, Refill RX's bills list each ingredient separately along with the corresponding charge for each. The total billed amount for Refill RX's compounded products varies from approximately $845.61 to $1,374.19 for a single Fraudulent Compounded Pain Product.

168. In support of its charges, Refill RX submitted: (i) the Prescribing Defendants' prescription forms, bearing the pre-printed or rubber-stamped name and formula of the compounded drug product; (ii) a "No-Fault" form, known as an NF-3 Form, which includes the purported NDC numbers, units, and corresponding charges for each ingredient in the billed-for Fraudulent Compounded Pain Creams; (iii) an invoice from Refill RX listing the quantities of the

compounds in the Fraudulent Compounded Pain Creams, the name of the prescribing physician, and the total amount due; and (iv) the AOB in which the Insured assigned their benefits to Refill RX.

169.    The NDC numbers listed on the NF-3 Forms submitted by Refill RX identify the various alleged sources from which Refill RX obtains the ingredients for its Fraudulent Compounded Pain Creams and the alleged AWPs for such products.

170.    Notably, Refill RX never submitted its purchase invoices demonstrating how much Refill RX paid the supplier for the ingredients or the quantities in which the ingredients were obtained.

171.    The Pharmacy Defendants also refused to identify for GEICO the volume of prescriptions dispensed for the Fraudulent Compounded Pain Creams, notwithstanding Refill RX's legal obligation to maintain appropriate records of prescriptions.

172.    The Pharmacy Defendants, purely to exploit the No-Fault reimbursement regulations relating to pharmaceutical products, intentionally assembled large combinations of drugs to produce each of the Fraudulent Compounded Pain Creams.

173.    The combination of numerous drugs in each of the Fraudulent Compounded Pain Creams have no proven, documented topical therapeutic effect different than commercially available, FDA products available at a fraction of the cost.

174.     The sole reason for the Pharmacy Defendants' intentional assembling of large combinations of drugs was to inflate the charges and maximize their billing to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily reimbursed for each individual ingredient contained in a compounded drug product.

## VI.    The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

175.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Refill RX seeking payment for the pharmaceuticals for which it is ineligible to received payment.

176.    These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Compounded Pain Creams were medically necessary.  In fact, the Pharmacy Defendants produced and dispensed the Fraudulent Compounded Pain Creams pursuant to predetermined fraudulent protocols solely to financially enrich themselves, without regard for the topical efficacy of the compounded drug creams or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost.

(ii)    The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants complied with all material licensing laws and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Pharmacy Defendants did not comply with all material licensing laws in that the Defendants participated in illegal, collusive agreements in which Refill RX solicited and received formulaic and medically unnecessary prescriptions from licensed physicians and/or their associates for the Fraudulent Compounded Pain Creams produced by Refill RX in violation of law; and

(iii)   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Pharmacy Defendants complied with all material licensing laws and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Pharmacy Defendants did not comply with all material licensing laws in that they engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering Refill RX ineligible to receive reimbursement for No-Fault insurance benefits.

**VII.**     **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

177.     The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

178.     To induce GEICO to promptly pay the charges for the Fraudulent Compounded Pain Creams, the Defendants have gone to great lengths to systematically conceal their fraud.

179.     Specifically, the Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that the Defendants (i) violated licensing laws governing manufacturers and large-scale drug outsourcing facilities of compounded drugs; (ii) have been involved in collusive, kickback arrangements to generate voluminous prescriptions pursuant to a fraudulent predetermined treatment and billing protocol, without regard to genuine patient care; and (iii) prescribed and dispensed Fraudulent Compounded Pain Creams that have no efficacious value and grossly exceed the cost of effective FDA-approved medications; and (v) intentionally assembled large combinations of drugs into purported compounded pain creams solely to inflate the billing to GEICO and other New York insurance companies.

180.     In accordance with the No-Fault Laws, GEICO either: (i) timely denied the pending claims for No-Fault Benefits submitted through Refill RX; (ii) timely issued requests for additional verification with respect to the pending claims for No-Fault Benefits submitted through Refill RX, yet failed to obtain complete compliance with the requests for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through Refill RX, or to request additional verification of those claims, has not yet expired.

181.     The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-

consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Refill RX continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Refill RX has been engaged in fraud.

182.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $231,000.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

183.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**THE FIRST CLAIM FOR RELIEF**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

184.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

185.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $400,000.00 in fraudulent billing for the Fraudulent Compounded Pain Creams that Refill RX has submitted to GEICO.

186.    Refill RX has no right to receive payment for any pending bills submitted to GEICO because:

> (i)    the Defendants made false and fraudulent misrepresentations to GEICO in that the Fraudulent Compounded Pain Creams were not medically necessary and were provided – to the extent they were provided at all – pursuant to predetermined fraudulent protocols designed solely to

financially enrich themselves, based on prescriptions solicited by Refill RX without regard for the topical efficacy of the compounded drug creams or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost;

(ii)    the Defendants engaged in illegal, collusive agreements in which the Pharmacy Defendants solicited and received formulaic and medically unnecessary prescriptions from the Prescribing Defendants for the Fraudulent Compounded Pain Creams produced by Refill RX in violation of law; and

(iii)    The Pharmacy Defendants engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

187.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Refill RX has no right to receive payment for any pending bills submitted to GEICO.

**THE SECOND CLAIM FOR RELIEF**
**Against Sharafyan**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

188.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

189.    Refill RX is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

190.    Sharafyan knowingly has conducted and/or participated, directly or indirectly, in the conduct of Refill RX's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years, seeking payments that Refill RX was not eligible to receive

under the No-Fault Laws because: (i) the billed-for services were not medically necessary and were billed pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants, based on "rubber-stamped" prescriptions solicited by Refill RX without regard for the topical efficacy of the compounded drug creams or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost; (ii) the Defendants participated in illegal, collusive agreements in which Refill RX solicited and received formulaic and medically unnecessary prescriptions from the Prescribing Defendants for the Fraudulent Compounded Pain Creams produced by Refill RX in violation of law; and (iii) Refill RX engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

191.     Refill RX's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Sharafyan, operated Refill RX, inasmuch as Refill RX never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Refill RX's to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Refill RX to the present day.

192.     Refill RX is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault insurance

system, engage in illegal, collusive arrangements involving compounded drug product prescriptions, and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants.  These inherently unlawful acts are taken by Refill RX in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

193.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $231,000.00 pursuant to the fraudulent bills submitted by the Defendants Refill RX.

194.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against Sharafyan and the Prescribing Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

195.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

196.    Refill RX is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

197.    Sharafyan, and the Prescribing Defendants are employed by and/or associated with the Refill RX enterprise.

198.    Sharafyan, and the Prescribing Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Refill RX enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to

submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Refill RX was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and were billed pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants, based on "rubber-stamped" prescriptions solicited by Refill RX without regard for the topical efficacy of the compounded drug creams or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost; (ii) the Defendants participated in illegal, collusive agreements in which Refill RX solicited and received formulaic and medically unnecessary prescriptions from the Prescribing Defendants for the Fraudulent Compounded Pain Creams produced by Refill RX in violation of law; and (iii) Refill RX engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

199.    Sharafyan, and the Prescribing Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

200.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $231,000.00 pursuant to the fraudulent bills submitted by the Defendants Refill RX.

201.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and

**THE FOURTH CLAIM FOR RELIEF**
**Against the Pharmacy Defendants**
**(Common Law Fraud)**

202.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

203.    The Pharmacy Defendants intentionally and knowingly made false and fraudulent

statements of material fact to GEICO and concealed material facts from GEICO in the course of

their submission of hundreds of fraudulent charges seeking payment for the Fraudulent

Compounded Pain Creams.

204.    The false and fraudulent statements of material fact and acts of fraudulent

concealment include: (i) in every claim, the representation that the billed-for services were

medically necessary and properly billed in accordance with the Pharmacy Fee Schedule, when in

fact the billed-for services were not medically necessary and were billed pursuant to

predetermined fraudulent protocols solely to financially enrich the Defendants, based on "rubber-

stamped" prescriptions solicited by Refill RX without regard for the topical efficacy of the

compounded drug creams or the availability of a wide range of commercially available, FDA-

approved medications proven to have therapeutic effects available at a fraction of the cost; (ii) in

every claim, the representation that Refill RX was properly licensed and, therefore, eligible to

receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-

3.16(a)(12), when in fact the Defendants participated in illegal, collusive agreements in which

Refill RX solicited and received formulaic and medically unnecessary prescriptions from

licensed physicians and/or their associates for the Fraudulent Compounded Pain Creams

produced by Refill RX in violation of law; and (iii) in every claim, the representation that Refill

RX was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to

Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Refill RX engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

205.    The Pharmacy Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Refill RX that were not compensable under the No-Fault Laws.

206.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $231,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Refill RX.

207.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

208.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THE FIFTH CLAIM FOR RELIEF
### Against the Prescribing Defendants
### (Aiding and Abetting Fraud)

209.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

210.    The Prescribing Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the Pharmacy Defendants.

211.    The acts of the Prescribing Defendants in furtherance of the fraudulent scheme include knowingly purporting to prescribe the Fraudulent Compounded Pain Creams and permitting their names to be used in the billing, prescription records and treatment reports submitted in support of the Fraudulent Compounded Pain Creams despite their knowledge that Refill RX was ineligible to bill for or to collect No-Fault Benefits in connection with the Fraudulent Services because: (i) the Defendants produced, prescribed, and dispensed the Fraudulent Compounded Pain Creams pursuant to predetermined fraudulent protocols solely to financially enrich themselves, based on prescriptions solicited by Refill RX without regard for the topical efficacy of the compounded drug creams or the availability of a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost; (ii) the Defendants participated in illegal, collusive agreements in which Refill RX solicited and received formulaic and medically unnecessary prescriptions from licensed physicians and/or their associates for the Fraudulent Compounded Pain Creams produced by Refill in in violation of law; and (iii) Refill RX engaged in illegal bulk compounding by specializing in creating and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault insurance benefits.

212.    The conduct of the Prescribing Defendants in furtherance of the fraudulent scheme was significant and material.  The conduct of the Prescribing Defendants was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for Refill RX to obtain payment from GEICO and from other insurers.

213.    The Prescribing Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Refill RX for medically unnecessary and illusory Fraudulent Compounded Pain Creams that were not compensable under the No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

214.    The conduct of the Prescribing Defendants caused GEICO to pay approximately $231,000.00 pursuant to the fraudulent bills that the Defendants submitted or caused to be submitted through Refill RX.

215.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

216.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE SIXTH CLAIM FOR RELIEF**
**Against the Pharmacy Defendants**
**(Unjust Enrichment)**

217.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

218.    As set forth above, the Pharmacy Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

219.    When GEICO paid the bills and charges submitted by or on behalf of Refill RX for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

220.    The Pharmacy Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted and profited from, as

a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

221.    The Pharmacy Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

222.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $231,000.00.

## JURY DEMAND

223.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Refill RX has no right to receive payment for any pending bills, amounting to approximately $400,000.00 submitted to GEICO;

B.      On the Second Claim For Relief against the Sharafyan, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $231,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim For Relief against the Sharafyan and the Prescribing Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $231,000.00, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim For Relief against the Pharmacy Defendants and the Prescribing Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $231,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Claim For Relief against the Prescribing Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $231,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

F.      On the Sixth Claim for Relief against the Pharmacy Defendants, a recovery in favor of GEICO in an amount to be determined at trial but approximately $231,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       May 11, 2018

                              RIVKIN RADLER LLP

                              By: _____
                                   Michael A. Sirignano (MS 5263)
                                   Barry I. Levy (BL 2190)
                                   Joshua D. Smith (JS 3989)
                                   926 RXR Plaza
                                   Uniondale, New York 11556
                                   (516) 357-3000

                                   *Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*

50